

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 7, 2023**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| MARCUS ANTHONY BRAZIEL, | § | Case No.:  21-50170-rlj7 |
| | § | |
| Debtor. | § | |
| _____ | § | _____ |
| | § | |
| Joanna Leyva, Individually and as | § | |
| Representative of the Estate of Leilah | § | |
| Hernandez, Deceased, Nathan Hernandez, | § | |
| Rodolfo Trejo, Gary Griffith, Sharon | § | |
| Griffith, Rebecca Griffith, as next friend of | § | |
| A.G. and Z.G., minor children, and Mary | § | |
| Brown, Individually and as Representative | § | |
| of the Estate and Wrongful Death | § | |
| Beneficiary of Kameron Brown, Deceased, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Adversary No. 22-05000 |
| Marcus Anthony Braziel, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## <u>MEMORANDUM OPINION</u>

1

On October 8, 2016, Marcus Braziel illegally sold an "AR-15 style" rifle to Seth Ator. Just less than three years later, on August 31, 2019, Ator used the rifle in a mass shooting in Midland and Odessa, Texas, killing seven people and wounding twenty-five more.  In the aftermath of the shooting, the plaintiffs, who are or represent victims of the shooting, sued Braziel in Ector County, Texas, asserting claims on negligence-based theories of liability. Braziel, who pleaded guilty to criminal charges of illegally selling firearms without a license and tax evasion, filed this chapter 7 bankruptcy case to discharge any civil liabilities he may have as a result of the state-court claims against him.  The bankruptcy filing stayed the suit in Ector County.

The plaintiffs filed this adversary proceeding in Braziel's chapter 7 bankruptcy case.  The plaintiffs contend that Braziel's conduct in connection with his bankruptcy case disqualifies him from receiving a discharge of his debts in bankruptcy.  They assert three causes of action against Braziel: first, they contend that Braziel should be denied the bankruptcy discharge under § 727(a)(2) because he transferred property within the year prior to his bankruptcy filing with intent to "hinder, delay, or defraud a creditor"; second, they submit the discharge must be denied under § 727(a)(4) because Braziel "knowingly and fraudulently" made false oaths during his case; third, they allege that his illegal sale of the assault rifle to Ator constituted a "willful and malicious injury" to the plaintiffs, which bars the discharge of their potential claims under § 523(a)(6) of the Code.[1]  Braziel contests the plaintiffs' claims and asks that the discharge be granted.

As set forth below, the Court concludes that transfers made by Braziel in the year prior to his bankruptcy filing were not made to hinder, delay, or defraud his creditors; the Court further

---

[1] "Section" or "§" refers to 11 U.S.C., the Bankruptcy Code, unless otherwise stated.

concludes that though Braziel failed to affirmatively disclose several transfers in his bankruptcy

schedules, such "omissions" were not knowingly and fraudulently made.  For the cause under

§ 523(a)(6), the Court finds that Braziel's sale of the assault rifle almost three years prior to the

shooting does not implicate the dischargeability exception of § 523(a)(6).

The Court therefore denies the relief requested by the plaintiffs.

## I.  Background

### A.

Marcus Braziel assembled and sold AR-style rifles and other firearms without holding a

federal license to engage in the business of manufacturing and selling firearms.  Between

approximately April 2014 and October 2017, Braziel purchased 94 firearms from multiple

dealers.  Joint Pre-Trial Order, ECF No. 34 at 6 ¶ 19.[2]  At least 70 of the firearms were then sold

by Braziel.[3]  *Id.*

On October 8, 2016, Braziel sold a firearm to Seth Ator.  *Id.* at 6 ¶ 17.  Under federal law,

Seth Ator was prohibited from buying or possessing a weapon due to a disqualifying mental

health condition.  *Id.* at 6 ¶ 16.  Braziel did not perform a background check, as required for

federally licensed firearms dealers.  Had he done so, Braziel would have known that Seth Ator

was disqualified from purchasing or possessing the weapon.  *Id.* at 7 ¶ 23.

On August 31, 2019, Seth Ator, in a mass shooting, killed seven people and injured

twenty-five more.  *Id.* at 6 ¶ 15.

After the shooting, a federal criminal investigation began.  *Id.* at 7 ¶ 27.  Braziel testified

here that the publicity of the investigation motivated the Braziels, he and his wife Vanessa, to

---

[2] "ECF No." refers to the numbered docket entry in Adversary No. 22-05000, unless otherwise stated.

[3] The unsold firearms were seized by the federal government as reported in Braziel's amended statement of financial affairs.  He reported that 14 pistols, 5 rifles, 2 shotguns, 3 revolvers, and 15 rounds of ammunition were seized on January 6, 2021.  Case No. 21-50170, ECF No. 21 at 5.

relocate.  They sold their residence and purchased a smaller home in a cash deal with the equity

from their prior residence ($123,511) and an additional $85,000 in cash.  *See* Case No. 21-50170,

ECF No. 20 at 9.  The Braziels were scaling back—their prior house sold for $400,000 with a

mortgage of over $247,000; the new home cost $210,000 and was purchased without a mortgage.

Def. Ex. D-2 at 22; Pl. Exs. P-18 and P-19.  Both the sale of their prior home and purchase of the

new one took place on November 8, 2019.  ECF No. 34 at 10 ¶ 49.

The criminal investigation ultimately led to federal criminal charges against Braziel.  The

criminal charges were brought under Cause No. 5:20-CR-00128-H, U.S. District Court, N.D. of

Texas, Lubbock Division.  *Id*. at 7 ¶ 28.  Braziel was charged with "Dealing and Manufacturing

Firearms Without a License" in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D)

and with "Subscribing to a False Tax Return" in violation of 26 U.S.C. § 7206(1).  *Id*. at 7 ¶¶ 29–

30.  Braziel pleaded guilty to both charges, and his punishment included two years

imprisonment.  *Id*. at 7 ¶ 31.

In August 2020, victims of the shooting initiated a lawsuit in the 70th District Court of

Ector County, Texas, under Cause No. A-20-08-0905-CV, against multiple defendants including

Braziel.  *Id*. at 7 ¶ 24.  The state court suit alleges negligence, negligence per se, gross

negligence, and public nuisance.  *Id*.  Braziel filed bankruptcy on November 2, 2021, thereby

invoking the automatic stay that halted the plaintiffs' prosecution of their claims against Braziel

in the state-court action.  *Id*. at 3 ¶ 6, 7 ¶ 26.

After entering his guilty plea, Braziel surrendered himself into custody on April 7, 2021.

*Id*. at 7 ¶ 32.  In his testimony at trial of this matter, Braziel clarified the relevant dates of his

incarceration.  After his surrender, he was placed in El Reno Federal Correctional Institution.  On

December 29, 2021, he was released to a halfway house in Lubbock, Texas.  He remained there

until May 25, 2022, when he moved to home confinement.  During home confinement, Braziel

lived with his then ex-wife and their daughter.  Braziel's confinement was relegated to

"supervised release" on August 5, 2022.

Less than one month after Braziel began his time in El Reno, his wife, Vanessa, filed for

divorce.[4]  *See id.* at 8 ¶ 38.  The Braziels were married in August 2000 and lived together

continuously until Braziel reported to federal prison in April 2021.  *Id.* at 8 ¶ 39.  Braziel

testified that Vanessa threatened him with divorce several times but that he didn't take those

threats seriously.  He said he was surprised by the divorce petition.  The divorce proceedings

took place while Braziel was in prison.  For the division of their marital property, Vanessa

received property exceeding $380,000 in value, while Braziel received property valued at

approximately $145,000.  The final divorce decree, entered July 21, 2021, comported with a

mediated settlement agreement.  *Id.* at 9 ¶ 42.

### B.

As stated, Braziel filed his bankruptcy petition on November 2, 2021—after the divorce

but prior to being released from prison.  Braziel's original petition and schedules did not disclose

several items, including the sale of his home, payments to his criminal attorney for representation

in the federal criminal case, the sale of a 2005 Lexus LS 430, the trade-in of a 2006 Lexus

GX470 toward the purchase of a 2018 Toyota Rav4, the transfer of $49,405.97 from a joint

brokerage account to Vanessa, the posting (and refund) of an appearance bond in his criminal

case, payments to his civil attorney for representation in the state court action, the closure of a

---

[4] The divorce petition was filed on May 3, 2021 and styled "In the Matter of the Marriage of Vanessa Braziel and
Marcus Anthony Braziel."  It was filed in the 99th District Court of Lubbock County, Texas, under Cause No. 2021-
544246.  Joint Pre-Trial Order, ECF No. 34 at 8 ¶ 37.

joint brokerage account, the payment of court costs and fines, a contribution to the Texas County
& District Retirement System, and dividend income he received.

On December 14, 2021, Braziel attended his section 341 meeting of creditors
telephonically and gave sworn testimony. There, he stated he had read his bankruptcy petition
and his schedule of assets and debts and statement of financial affairs (collectively, "Schedules")
filed in this case. When asked, he testified the documents were correct and that no changes
needed to be made. During the meeting, however, he disclosed that there was also an additional
car, a 2011 Camry, that he transferred within four years prior to bankruptcy.[5] Joint Pre-Trial
Order, ECF No. 34 at 12 ¶ 59.

C.

On February 11, 2022, the plaintiffs to the state-court suit filed this adversary case
against Braziel. ECF No. 1. The plaintiffs ask the Court to deny Braziel's discharge under
§ 727(a)(2) for fraudulent transfers and § 727(a)(4)(A) for false oaths.[6] ECF No. 28.
Alternatively, the plaintiffs ask the Court to hold that any debt owed them is nondischargeable
under § 523(a)(6) as a debt arising from a willful and malicious injury caused by Braziel. *Id.*

Potential omissions became apparent at Vanessa Braziel's deposition on August 4, 2022.
Joint Pre-Trial Order, ECF No. 34 at 12 ¶ 60. The same is true of Braziel's deposition on August
5, 2022, which was continued to November 30, 2022. *Id.* at 12–13 ¶ 61.

On November 16, 2022, Braziel filed an amended petition and Schedules. Case No. 21-
50170, ECF Nos. 18, 19, 20. After his deposition on November 30, 2022, Braziel filed a second
amended statement of financial affairs on December 2, 2022 to add dividend income that he had
previously failed to list. Case No. 21-50170, ECF No. 21.

---

[5] The 2011 Camry transfer was not listed in the original statement of financial affairs.
[6] The § 727(a)(4)(A) cause of action was added in the amended complaint. ECF No. 28.

6

D.

For their cause under § 727(a)(2), plaintiffs contend that the division of property in the

Braziels' divorce was a transfer made with the intent to defraud creditors and thus Braziel's

discharge must be denied.  They also contend that omissions in Braziel's Schedules amount to a

false oath that warrants denying his discharge under § 727(a)(4)(A).  The plaintiffs' third cause

of action is under § 523(a)(6), where they contend that the claims they hold against Braziel

should not be discharged as they arose from a willful and malicious injury caused by Braziel's

illegal sale of the AR-style rifle to Seth Ator.

Braziel contests the causes asserted by the plaintiffs.

II.  Discussion

The Court's jurisdiction of this case and proceeding derives from 28 U.S.C. § 1334(b),

§ 157(a), and the Northern District of Texas's Order of Reference of Bankruptcy Cases and

Proceedings Nunc Pro Tunc, Misc. Order 33.  This matter is a core proceeding.  28 U.S.C.

§ 157(b)(2)(A), (I), (J).

A.

The Bankruptcy Code requires that an individual debtor be discharged of his or her debts

unless one of the statutory grounds for denial of that discharge is proven.  § 727(a); *see Simmons*

*v. Bohanna (In re Bohanna)*, No. 18-4065, 2019 WL 7580173, at *8 (Bankr. E.D. Tex. Nov. 15,

2019).  Denying a debtor's discharge is an extreme remedy.  *Pher Partners v. Womble (In re*

*Womble)*, 289 B.R. 836, 845 (Bankr. N.D. Tex. 2003) (citing *Rosen v. Bezner*, 996 F.2d 1527,

1531 (3d Cir. 1993)).  Only "very specific and serious infractions" warrant denying discharge.

*Martin Marietta Materials Sw, Inc. v. Lee (In re Lee)*, 309 B.R. 468, 476 (Bankr. W.D. Tex.

2004) (citing *Ichinose v. Homer Nat'l Bank (In re Ichinose)*, 946 F.2d 1169, 1172 (5th Cir. 1991)).

Exceptions to a debtor's discharge under § 727 "are construed strictly against the creditor and liberally in favor of the debtor." *Laughlin v. Nouveau Body & Tan, L.L.C. (In re Laughlin)*, 602 F.3d 417, 421 (5th Cir. 2010) (quoting *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)). "The same construction principles favoring a debtor are imposed in an action to determine the dischargeability of a particular debt." *In re Bohanna*, 2019 WL 7580173, at *9. Whether a particular debt is dischargeable—as opposed to a discharge of all debts—is governed by § 523 of the Bankruptcy Code.

The standard of proof for denying a discharge under § 727 and the dischargeability of a particular debt under § 523 is a preponderance of the evidence. *In re Duncan*, 562 F.3d at 695; *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991).

B.

Section 727(a)(2) – Claim of Fraudulent Transfer Within Year of Filing

Plaintiffs object to the discharge of Braziel's debts on the ground that he fraudulently transferred "property of the debtor" within one year of filing his bankruptcy petition. "The court shall grant the debtor a discharge, unless … the debtor, with intent to hinder, delay, or defraud a creditor[,] … transferred … property of the debtor, within one year before the date of the filing of the petition[.]" § 727(a)(2). "In order to deny discharge, the statute requires that four elements be proven: (1) a transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate." *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989) (referencing *In re Reed*, 18 B.R. 462 (Bankr. E.D. Tenn. 1982)).

1.

Under the amended complaint, the "transfers" for the claim mostly arise from the division

of property made under the Braziels' divorce decree.[7]  ECF No. 28 ¶¶ 70–71.  The parties

stipulated the divorce resulted in an uneven distribution of assets: Vanessa Braziel received

$380,000 worth of assets, while Braziel received $145,000.  ECF No. 34 at 9 ¶ 46.  Braziel

contends that the uneven distribution of assets was fair under the circumstances.

To the first element, § 101(54)(D) defines "transfer" as "each mode, direct or indirect,

absolute or conditional, voluntary or involuntary, of disposing of or parting with … property …

[or] an interest in property."  "A transfer of 'title' is not necessary for a 'transfer' of an 'interest

of the debtor in property' to occur. In fact, in the realm of marital property, numerous courts

have held that a divorce decree dividing assets effects a 'transfer' under the Bankruptcy Code."

*Wiggains v. Reed (In re Wiggains)*, 2015 WL 1954438, at *13, n.115 (Bankr. N.D. Tex. April 28,

2015).[8]  The divorce decree satisfies the transfer element.

Second, the property transferred must have been the debtor's.  The divorce decree

ostensibly divided the couple's community property.  Subject to the discussion below concerning

the Vanguard brokerage account that was awarded to Vanessa, the divorce decree concerned

property in which Braziel held an interest.  Under the divorce decree, Vanessa Braziel received

---

[7] Other transfers asserted by the plaintiffs in their § 727(a)(2) action are discussed below after the main divorce
issue.
[8] In a footnote, the *Wiggains* court referred to a Fifth Circuit case, *In re Erlewine*, in which the Circuit indicated a
divorce decree may be a transfer under the Code:
> While we recognize that referring to the court's judgment as effecting a "transfer" is perhaps
> counterintuitive, the Bankruptcy Code expansively defines "transfer" as embracing "every mode,
> direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with
> property or with an interest in property, including retention of title as a security interest and
> foreclosure of the debtor's equity of redemption." As *Besing* pointed out, Congress intended the
> definition to be as broad as possible. In this appeal, the parties agree that the divorce decree effected
> a transfer.

*Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205, 211 n.7 (5th Cir. 2003) (internal citations omitted) (referencing *In
re Besing*, 981 F.2d 1488 (5th Cir. 1993)).

the house and furnishings, certain bank accounts,[9] the refunded appearance bond, a 2002 Lexus,

a 2018 Toyota Rav4, and her retirement accounts (valued at approximately $130,196).  Braziel

was awarded a retirement account and two IRAs, the total value of which was $145,000.

Complications related to the property-of-the-debtor prong of § 727(a)(2) grow from one

account awarded to Vanessa Braziel that is described in the divorce decree as a "Vanguard

brokerage account *with contents of separate property from a personal injury settlement*," valued

at $52,136.  Pl. Ex. P-11 at 5 (emphasis added).  Separate property of a non-filing spouse falls

outside the § 727(a)(2) analysis, as it is not the debtor's property.  The origin and movement of

funds, however, clouds the analysis.  The problem boils down to whether the settlement funds

were Vanessa Braziel's separate property *at the time of the divorce* (the divorce is when the

transfer occurred).

Texas law dictates that "the recovery for personal injuries sustained by the spouse during

marriage, except any recovery for loss of earning capacity during marriage[,]" is separate

property.  Tex. Fam. Code § 3.001(3).  Texas law creates a presumption that property possessed

by either spouse upon dissolution of marriage is community property unless clear and convincing

evidence proves otherwise.  Tex. Fam. Code § 3.003.

The evidence on the settlement funds is as follows: Vanessa was in a car accident and

received a personal injury settlement of $49,405.97, signed and dated by Vanessa on July 31,

2018.  Def. Ex. D-18.  It is unclear whether the personal injury settlement provides for any loss

of earnings.  Braziel testified, and as corroborated by monthly brokerage statements, $40,000 of

---

[9] The bank accounts awarded to Vanessa include "City Bank Joint Checking Account, number 7505," "City Bank Joint Savings Account, number 7513," "Chase Individual Checking Account in the name of Vanessa Braziel, number 0788," and "Chase Individual Savings Account in the name of Vanessa Braziel, number 5319."  Pl. Ex. P-11.

the settlement funds were deposited into a joint brokerage account[10] in August 2018. Pl. Ex. P-20. Braziel clarified that a separate $10,000 deposit in the joint brokerage account represented the balance of the settlement funds. The evidence also reflects that the settlement funds—or a like amount—were placed in a joint City Bank account, presumably a regular deposit account. Then, per the parties' stipulation here, "[o]n October 5, 2020 Braziel transferred $49,405.97 from a Vanguard brokerage account jointly owned by Braziel and Vanessa Braziel (his spouse at that time) into a Vanguard brokerage account solely owned by Vanessa Braziel."[11] ECF No. 34 at 10 ¶ 52. This Vanguard account must be the account distributed by the divorce decree because it contains what Braziel claims is Vanessa's personal injury settlement. The plaintiffs contend that the $49,405.97 transferred into Vanessa's brokerage account, which was later awarded to Vanessa Braziel in the divorce decree, cannot be traced from her personal injury settlement.

There are several questions that are unsupported by evidence: Did the personal injury settlement include lost wages?[12] What links the personal injury settlement's $49,405.97 to the money transferred to Vanessa's sole account? The tracing presented by Braziel fails to account for the personal injury settlement when it was in the joint brokerage account—no cognizable mechanism for tracing the funds track the funds while in the joint brokerage account.[13] One piece of evidence supporting the separate character of the personal injury settlement is the

---

[10] This joint brokerage account was the account closed before the bankruptcy in December 2020. *See* Joint Pre-Trial Order, ECF No. 34 at 11 ¶ 55.

[11] The transfer from the joint brokerage account to Vanessa Braziel's separate account falls outside the one-year limit for § 727(a)(2); however, the characterization of the funds is still necessary because the divorce decree purports to distribute an account holding funds from the personal injury settlement.

[12] "When a spouse receives a personal-injury settlement from a lawsuit during marriage, some of which could be separate property and some of which could be community property, it is that spouse's burden to demonstrate which portion of the settlement is his or her separate property." *Harrell v. Hochderffer*, 345 S.W.3d 652, 657 (Tex. App.—Austin 2011, no pet.).

[13] No arguments put forward a tracing method, such as community-out-first, where community property is presumed to be moved out of the account first. *See Huval v. Huval*, No. 09-06-023 CV, 2007 WL 1793771, at *1-2 (Tex. App.—Beaumont June 21, 2007, no pet.) (mem. op.) (discussing tracing). This would aid the Court in determining what happened to the funds in the joint brokerage account in the two years that the personal injury settlement remained in the account.

divorce decree, but it is unclear to the Court how or why the agreed property distribution labeled the personal injury settlement as separate property.

The evidence provides a murky picture of how the personal injury settlement came to be and where it went, but that cannot satisfy the clear and convincing standard required to overcome the community-property presumption. Braziel did not provide clear and convincing evidence that the personal injury settlement was separate property *at the time of divorce*.

The Court presumes that all property transferred under the divorce decree was community property.

Third, the Court turns to the one-year timing requirement of § 727(a)(2). The transfer of property must have occurred within one year prior to the bankruptcy petition. The divorce decree was signed on July 20, 2021, less than four months prior to the bankruptcy filing. Transfers made under the divorce decree satisfy the time element of § 727(a)(2).

Fourth, the transfer must be made with the intent to hinder, delay, or defraud a creditor. § 727(a)(2). "[E]vidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge. Constructive intent is insufficient." *In re Chastant*, 873 F.2d at 91 (internal quotation marks and citations omitted). "[A]ctual intent . . . may be inferred from the actions of the debtor and may be shown by circumstantial evidence." *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701–02 (5th Cir. 2003) (second alteration in original) (quoting *In re Chastant*, 873 F.2d at 91).

Factors that aid courts in processing the circumstantial evidence of actual intent as identified by the Fifth Circuit are:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or

cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*In re Chastant*, 873 F.2d at 91 (citation omitted).

In determining the intent behind property distributions in a divorce, bankruptcy courts have covered the spectrum of outcomes. *Compare MWI Veterinary Supply Co. v. Rodgers (In re Rodgers)*, 315 B.R. 522 (Bankr. D.N.D. 2004) (Holding the debtor's divorce was not a sham and the property distribution was not a fraudulent transfer even when the marital property was not evenly divided, the debts were assumed by the debtor, the debtor traveled with his ex-wife days before their divorce was finalized, the debtor regularly continued to use property awarded to his ex-wife, the ex-wife continued to work for the debtor, and they continued to live together.), *with Rogers v. Boba (In re Boba)*, 280 B.R. 430 (Bankr. N.D. Ill. 2002) (Holding that property division at divorce was a fraudulent transfer. The court granted summary judgment, holding no reasonable fact finder could find anything but an intent to defraud creditors when the debtor and his ex-wife entered an agreed transfer of property through a "fast-track divorce" on the eve of bankruptcy and the property distribution was not disclosed in his schedules. The court also considered that the debtor was a businessman with an understanding of the importance of disclosure—more relevant to the § 727(a)(4)(A) action also heard by the court—and the fact that the debtor was represented by counsel.).

Factor 1: The divorce decree made an unequal division of property. But it was not inequitable. The state court found that the division of property was "a just and right division of the parties' marital estate." Pl. Ex. P-11 at 2. The Court also heard testimony from Howard

Bailey,[14] a family law attorney, that the unequal distribution of the marital estate was not grossly

disproportionate.  Context is important—the transfers were made upon a divorce, which

necessitated a division of the Braziels' property.  *See* Pl. Ex. P-11.  The divorce happened, in no

small part, because of Braziel's legal troubles stemming from his crimes.  A disproportionate

award of marital property in this situation is not, alone, indicative of a fraudulent transfer.

Factor 2: The relationship between the parties is complicated.  The couple is divorced but

currently living together.  Braziel stated that he surrendered himself to federal prison on April 7,

2021 and was released from that facility to a halfway house on December 29, 2021.  On May 25,

2022, he was released from the halfway house to home confinement.  Braziel's home

confinement ended on August 5, 2022.  The remainder of his sentence has been and will be

served under "supervised release."  At trial, there was no substantive discussion of Braziel's

living situation after his release from the halfway house.  Family relationships, including ex-

spouses, are complex; in some circumstances, divorce may be a mechanism to perpetrate a fraud,

while in other circumstances, divorce may be merely the result of an overly strained marriage.

Here, the fact that Vanessa Braziel—not Marcus Braziel—initiated the divorce indicates that

Braziel did not concoct the divorce as a scheme to shelter assets from creditors.  There is no

evidence of collusion between Braziel and Vanessa.  And there is no evidence that the property

division in fact sheltered assets from creditors.

Factor 3: Braziel retains some benefits of the transferred property.  The couple's family

home was awarded to Vanessa, but Braziel currently resides at the house.  The continued use of

the residence after the transfer might, with other evidence of fraudulent intent, satisfy the

requisite intent.

---

[14] Howard Bailey was not Braziel's attorney during the divorce.  Rob Hogan represented Braziel in the divorce. Pl.
Ex. P-11 at 15.

Factor 4: Regarding the financial condition of Braziel before the transaction, Braziel was in federal prison while Vanessa was working and supporting their 19-year-old daughter.  Braziel testified that he worked as a production clerk for Unicor while in federal prison.[15]  Braziel's amended Schedule I discloses he had a monthly income of $68.66.  Case No. 21-50170, ECF No. 18.  Braziel's professional license was revoked; he can no longer work as a respiratory therapist. At the time of the divorce, his future was uncertain.  (Beginning in December 2022, Braziel became employed as a quality director and HIPAA compliance officer at Brownfield Medical Center.)

Factor 5: Braziel's financial difficulties began prior to the divorce.  The threat of adverse claims—both criminal and civil—materialized well before the divorce decree.[16]  Braziel's legal woes at the time of the divorce indicate, at least in part, an intent to separate his assets from assets that he considered to be Vanessa's.

Factor 6: The big-picture chronology invites suspicion.  The mass shooting occurred in August 2019.  The plaintiffs sued Braziel in August 2020.  Braziel's incarceration began in April 2021.  Vanessa filed for divorce in May 2021, with the issuance of the final divorce decree in July 2021.  But context is critical.  Braziel was in legal jeopardy, which could be a formative factor to his intent, and the transfers at issue resulted from a divorce petition filed by his wife. Braziel provided testimony that, while he was in prison, he was surprised by the divorce petition; although his wife apparently "threatened" him with divorce, Braziel said he did not take such threats seriously.

---

[15] According to Braziel's testimony, UNICOR offers employment to individuals within the custody of the Federal Bureau of Prisons.

[16] The federal criminal investigation began in August 2019, the civil suit was filed in August 2020, and the divorce decree was entered in July 2021.  ECF No. 34 at 7 ¶¶ 24, 27.

The factors blend together.  The transfers at issue were made under a divorce decree.
Both the relationship and the event-chronology are intertwined.  Vanessa filed the divorce
petition, unbeknownst to Braziel, and the two subsequently entered into an agreement for the
distribution of the marital estate.  As the factors are intertwined, the Court refrains from simply
tallying-up the factors; instead, the Court weighs the circumstances in assessing Braziel's intent.

The plaintiffs contend that the property division under the Braziels' divorce decree
effected a fraudulent transfer sufficient to block Braziel's discharge.  The division obviously
skewed in Vanessa's favor.  The value of the property she was awarded was two-and-a-half
times more than what Braziel received.  She got the house ($210,000) and furnishings, four
deposit accounts ($\approx$ $28,500), retirement accounts of over $130,000, $7,500 refunded from a
satisfied appearance bond in the criminal case, and two cars—a 2002 Lexus (no stated value) and
a 2018 Rav4 (no stated value but appears $\approx$ $23,000).  Braziel retained his retirement account
and two IRAs—the combined value of which was $145,000.

The Braziels had been married almost twenty-one years, and, except for Vanessa's
personal injury recovery, there is no evidence that any of the items of property constituted either
of the Braziels' separate property.

The division of property resulted from a mediated settlement that was approved by the
state court.  This Court finds the division neither unusual nor extraordinary.  Vanessa's award of
the house obviously tilts the division in her favor.  Two of the deposit accounts were owned in
her name and held $7,900 and $13,350, respectively.  The other two accounts were joint
accounts, one with $7,000 and the other with a zero balance.  She also kept her so-labeled
retirement accounts totaling $130,000.  Braziel kept his, as well.  The evidence reveals that
Vanessa paid for the $7,500 appearance bond and the 2018 Rav4 with "her" funds.

16

Vanessa's income during the marriage—at least in the few years prior to the divorce—was greater than Braziel's.  Braziel's criminal conviction from his illegal gun sales and its aftermath were, according to Braziel, the main cause of Vanessa's filing for divorce.  Braziel was thus the party principally at fault.

The property settlement reflects Braziel's need to consolidate and scale back his financial affairs as a result of his imprisonment.  He had no income and obviously no way to generate income to pay for expenses on a house or cars while incarcerated.  But it also reflects the practical realities of having to divide the marital property under a divorce.  Further, the division accords with each of his and Vanessa's financial condition.  She basically received what was hers, and he received what was his.

The division favored Vanessa but was not done with intent to defraud Braziel's creditors.

The Court does not construe Braziel's agreement to a division of marital property as rendering the divorce a guise for a fraudulent transfer.  Considering all the relevant facts and circumstances in light of the enumerated factors, the Court finds that Braziel did not have the intent to hinder, delay, or defraud creditors when he transferred property as part of the divorce decree.

2.

Braziel made other "transfers" that are relevant to the § 727(a)(2) action.  Such transfers, made within a year of the bankruptcy filing, include payments to Braziel's civil and criminal attorneys,[17] fines and court costs paid to the United States, the sale of a 2005 Lexus,[18] a

---

[17] The parties stipulate that Braziel paid $20,000 to his civil attorney in "[l]ate 2020."  Joint Pre-Trial Order, ECF No. 34 at 13 ¶ 62.  Braziel testified that he paid $4,830.25 in November 2020 and $12,562.61 in December 2020 to his civil attorney.  *See* Pl. Ex. P-47 & P-48.  But according to his amended Schedules, he paid his civil attorney $21,500 and an additional $7,560, and $2,000 of these funds were paid to his bankruptcy attorney for filing the chapter 7 case.  Case No. 21-50170, ECF No. 21 at 7, 10.

[18] Braziel used the proceeds from the sale of the 2005 Lexus to pay attorneys' fees.  Case No. 21-50170, ECF No. 20 at 11.

"catchup" contribution to the Texas County & District Retirement System, and funds paid to Braziel's bankruptcy counsel.[19]  *See* Joint Pre-Trial Order, ECF No. 34 at 13 ¶ 62.

The funds transferred for payment of attorneys' fees and court fines and costs were not made with fraudulent intent.  Such payments were made to obtain legal guidance at a time when Braziel needed such guidance or had to pay court fees and fines.  They were not made to place the funds outside the reach of creditors.

The "catchup" contribution is murkier.  The parties stipulate that $19,522.52 was paid into the Texas County & District Retirement System in March 2021.  ECF No. 34 at 13 ¶ 62.  Property was arguably transferred, and such transfer was made within a year of Braziel's petition.  *Id*.  At issue is whether the funds belonged to Braziel.  Braziel, by his testimony and in his amended Schedules, asserts the funds transferred were Vanessa's separate property as they came from her separate account.  In Texas, property possessed by a spouse during marriage is presumed community property unless proven otherwise by clear and convincing evidence.  Tex. Fam. Code § 3.003.  Braziel's assertions do not provide clear and convincing evidence that the catchup contribution was from Vanessa's separate property.  There is no evidence of how the funds came into Vanessa's possession.  The Court cannot determine the character of the property; the community-property presumption controls and the funds are treated as community property.

The funds were not transferred to a relative or friend, but rather to *his* retirement account.  (The Court assumes here that the movement of funds to Braziel's retirement account was a "transfer" under the statute.  *See* § 101(54).).  Braziel does not retain the immediate benefit of the property; the benefit is received in the future.  At the time he made the contribution, Braziel was

---

[19] The parties stipulated that the fees paid to Braziel's bankruptcy counsel were from the retainer held by his civil attorney.  Joint Pre-Trial Order, ECF No. 34 at 13 ¶ 62.

about to lose his respiratory-therapist license and would then be unable to contribute to the retirement system.  He surrendered himself to federal prison shortly after the contribution was made.[20]  The civil suit was pending at the time of the contribution, which indicates the transfer may have been made to shield the funds from any liability in the civil suit.[21]  Even so, the circumstances also indicate the payment was made with the intent to receive the full benefits of a retirement system that he was qualified to enjoy at the time of the transfer.  For purposes of plaintiffs' § 727(a)(2) claim, Braziel lacked the intent to hinder, delay, or defraud his creditors by making, or allowing, the transfer.

The Court denies plaintiffs' § 727(a)(2)-objection to Braziel's discharge.

C.

Section 727(a)(4)(A) – False Oath Claim

The plaintiffs' false oath charge is facially more complicated.  The plaintiffs assert Braziel should be denied a discharge because of his numerous "omissions" from his original Schedules.  Such omissions include the sale of a house, car sales, unaccounted-for income and transfers of funds, and payments for attorneys.[22]  The list of Braziel's omissions grew at the hearing when he disclosed other previously undisclosed transactions, including the sale of multiple vehicles, the proceeds of which totaled approximately $94,000.[23]  Such sales, however,

---

[20] The contribution was made in March 2021, and Braziel surrendered on April 7, 2021.

[21] Braziel testified that he met with his bankruptcy counsel in the latter part of 2020 but, at counsel's advice, he decided to wait to file a petition.  This indicates some pre-bankruptcy planning.

[22] Also at the hearing, plaintiffs' counsel highlighted a mistake in the original Schedules where Braziel checked the box that he did not live in a community property state on question 3 of his statement of financial affairs.  Braziel responded that he did not know what a community property state was.

[23] Braziel testified at the hearing that he sold a "classic car" for $24,000 in September 2018; he sold a "Chevy Cruze, a Jeep, and a Rhino UTV" in "May, June, and July" 2019 resulting in a $30,000 deposit in the joint brokerage account as reflected in the July 2019 statement; he consolidated by selling extra vehicles, specifically a "2010 Silverado, 2002 MR2 Toyota, and a 2012 Can-Am UTV," sold in September and October 2019, with those sales proceeds, $40,000, deposited in the joint brokerage account in December 2019.  *See* Pl. Exs. P-21, P-31, P-36.

took place more than two years prior to his petition, which is beyond the inquiry period under the Schedules.[24]

1.

Under § 727(a)(4)(A), the Court must deny the discharge if the debtor knowingly and fraudulently made a false statement in connection with the case. "To establish a false oath under this section, the creditor must show that '(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (alterations in original) (quoting *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992)). Omissions satisfy § 727(a)(4)(A) when the omissions are knowing and fraudulent. *See* 6 COLLIER ON BANKRUPTCY ¶ 727.04 (16th 2023); *In re Beaubouef*, 966 F.2d at 178.

The key question here—and the most difficult to assess—is whether Braziel's omissions satisfy the intent element. The Court will first summarily dispose of the other four elements before addressing Braziel's intent.

Braziel made several statements under oath in items filed with the Court—his original petition and Schedules and his amended Schedules. His statements at his § 341 meeting of creditors were also made under oath. Braziel arguably omitted numerous transactions. Such omissions clouded Braziel's financial history. While testifying, Braziel said he did not think the transfers were relevant at the time. But Braziel knew he was not being transparent. The first three elements of the § 727(a)(4)(A) claim are satisfied.

---

[24] In the statement of financial affairs, the debtor is asked to list transfers made within two years prior to the bankruptcy filing that are outside the ordinary course of business. But Braziel's counsel, at the § 341 meeting of creditors, asked about transfers made in the past *four* years. *See* Pl. Ex. P-17 at 7:1.

Omissions must be material to the bankruptcy case.  "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  *In re Beaubouef*, 966 F.2d at 178 (quoting *In re Chalik*, 748 F.2d 616, 617 (11th Cir. 1984)).  Importantly, this test is not concerned with the value of the omissions or how the omissions might harm creditors.  *In re Pratt*, 411 F.3d at 566.  Here, the omissions were directly related to the discovery of assets and disposition of those assets—for example, the sale of the Braziels' house and the purchase of a new home, the receipt of dividends, and the payment of various court fees and fines.  Although the undisclosed items may not have entered the bankruptcy estate or harmed creditors, the omissions do bear a relationship to Braziel's assets and transactions.  The materiality prong of § 727(a)(4)(A) is satisfied.

2.

Unlike § 727(a)(2)(A), where the debtor must have the intent to defraud a *creditor*, section "727(a)(4) does not … limit the objects of the debtor's fraudulent intent."  6 COLLIER ON BANKRUPTCY ¶ 727.04 (16th 2023).  "Circumstantial evidence may be used to prove fraudulent intent, and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."  *In re Duncan*, 562 F.3d at 695 (citations omitted).  Courts have held that a reckless indifference to the truth may satisfy the fraudulent intent element of a § 727(a)(4)(A) action.  6 COLLIER ON BANKRUPTCY ¶ 727.04 (16th 2023); *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001); *Kirchner v. Sticht (In re Sticht)*, No. 03-4003, 2005 WL 6441384, at *3 (Bankr. N.D. Tex. Oct. 20, 2005) (citing cases).

As originally filed on November 2, 2021, Braziel's Schedules were deficient and thus technically false. But a set of schedules that is 100% accurate is a rarity.

Braziel filed this case and prepared his original Schedules while in prison. Access to his attorney was severely limited. His Schedules reveal some indifference on his part to his duties to prepare complete and accurate schedules. Even for his amended Schedules, he described, at Part 6 of the statement of financial affairs, his losses within the prior year as follows:

> I was charged in Federal Court for a criminal offense for selling a gun 3 years before to a man who went crazy and killed a bunch of people. This disaster cost me my family, my freedom, my respiratory therapist license, my home, my savings, my reputation and may yet cost me my sanity. I did everything I could to protect my wife and kids before I went to prison yet I was served with a divorce petition in the penitentiary and am now accused of fraud. I did my best to provide detailed, complete information for my original bankruptcy filing, but could not access my records. I have spent thousands and thousands of dollars on attorney's fees in hopes of clearing my name and getting a fresh start.

Case No. 21-50170, ECF No. 20.

This is not a serious answer. It is perhaps reflective of Braziel's emotional state. It is troubling that it took Braziel over a year to file amended Schedules, and only then because of information regarding assets that he was confronted with as a result of Vanessa's deposition.

The stakes here are high. Denial of discharge is catastrophic for the debtor. The purpose of the bankruptcy filing is rendered for naught, and the individual debtor is left without an orderly way to address his financial hardship.

Braziel's deficiencies under his original Schedules principally concern his alleged failure to disclose "transfers." And there are several such transfers here. A debtor in bankruptcy is required to file schedules of assets and liabilities and a "statement of [his] financial affairs." 11 U.S.C. § 521. Such duties are the cost of obtaining a discharge in bankruptcy. A list of "transfers" is required under the promulgated forms used in filing bankruptcy. Braziel's omitted

transfers are those made within the two years prior to his bankruptcy filing.  From the evidence,

it appears Braziel filed a mostly-accurate *schedule of assets and liabilities*.

The omitted transfers are summarized as follows:

- the trade-in of a 2006 Lexus (value ≈ $4,500) upon purchase of the 2018 Toyota Rav4

- the contribution of $19,522 to his retirement account with funds drawn on Vanessa's "separate" account

- the $49,406 transfer in October 2020 from a joint money market account "to Vanessa's account," where such funds are stated to represent a personal injury settlement awarded to Vanessa

- the "transfers" made to Vanessa under the divorce decree—their house and specifically the funds used for the purchase of the house (the $123,511 of equity realized in the sale of their prior home and the additional $85,000 from insurance proceeds and jointly-held funds)

- the numerous payments made in connection with Braziel's criminal case: payments to his attorneys of $25,000 (for defense counsel), $8,100 (for a mock jury), $20,000 (to counsel for civil suit); $12,750 (fines and court costs); a $7,500 appearance bond (that was remitted back); and $10,000 to bankruptcy counsel for this adversary proceeding

- the sale of a 2005 Lexus 430 for $4,500, which funds were used for payment of attorney's fees

- the "transfer" of $12,562 from the closure of a Vanguard brokerage account in December 2020

The sheer volume of such omissions is troubling.  Braziel was incarcerated when he

prepared his Schedules and when he telephonically attended his § 341 meeting.  At the § 341

meeting, Braziel was asked by his counsel, "In the *four* years before you filed did you sell or

transfer any property of any value, other than the 2004 Toyota Camry that you titled in your

[son's] name, Ashton, anything other than that?"  Pl. Ex. P-17 at 7 (emphasis added).  Such an

un-rehearsed, broad catch-all question invites mistakes.  Braziel responded that "there should be

a 2011 Camry for my daughter, but that may have been before." *Id*.  Other transfers came to

23

light in a similar fashion, where Braziel or Vanessa would disclose a transfer that, apparently to

Braziel, was of no significance when he filed his petition and Schedules or made sworn

statements.  The statements Braziel made while in prison were made from his memory of the

past four years of his life; he used Corrlinks to communicate with counsel when compiling his

Schedules.  Corrlinks is an email-like system that he had access to while incarcerated, but that

access was limited in time and words.  Critically, Braziel had no access to his books or records.

From Vanessa's deposition on August 4, 2022, it became apparent that Braziel omitted

items from his Schedules.  *See* Def. Ex. D-1 at 33.  He amended his Schedules on November 16,

2022.  Case No. 21-50170, ECF Nos. 18, 20.  And then, after Braziel's deposition on November

30, 2022, he made additional amendments to his statement of financial affairs on December 2,

2022.[25]  Case No. 21-50170, ECF No. 21.  When the amendments were made, Braziel was in

home confinement and serving the remainder of his criminal conviction under supervised

release.  Braziel had full access to his books and records and could freely communicate with his

attorney.

The issue here is whether these omissions are in fact omissions under § 727(a)(4) and, if

so, were they knowingly and fraudulently made.  Resolving these questions is more difficult than

appears at first blush.  First, the statement of financial affairs at Part 7, which pertains to "Certain

Payments or Transfers," asks at questions 16 and 17 if the debtor, within one year, had *paid or*

*transferred any property to anyone* he conferred with for the bankruptcy case or anyone who

assisted him in dealing with his creditors.  Question 18 asks if, within the two years prior to the

bankruptcy filing: "did you *sell, trade, or otherwise transfer any property* to anyone, other than

property transferred in the ordinary course of your business or financial affairs?" (emphasis

---

[25] "[A]mendments … do not negate the fact that [debtor] made knowingly false oaths in his original schedules and
statement of financial affairs."  *In re Sholdra*, 249 F.3d at 382.

added).  For question 18, Braziel listed the items, including their "house and all equity," awarded to Vanessa under the divorce decree.  "Transfer" is a defined term in the Bankruptcy Code.  It means a creation of a lien, the retention of title as a security interest, a foreclosure, and the catchall "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property.  § 101(54).  Section 541 of the Code addresses "property of the estate" and identifies property that comes into, and thus constitutes, property of the bankruptcy estate.  It is anything but simple.

First, Braziel did not have the benefit of counsel by his side as he prepared his answers for the Schedules.  Second, he corrected the asserted omissions by his amended Schedules. Third, the question prompts are not entirely clear.  Is a payment the same as a transfer of property?  Fourth, the Court questions if the statement of affairs requires disclosure of payments to attorneys for his criminal case—the best practice is to include such payments.  Regardless, Braziel's alleged failure here does not reveal a specific intent to conceal the payments. Concealment serves no purpose, good or bad.  It is unclear if the $19,522 contribution to his retirement account and the $49,406 transfer from a joint account to another account are in fact transfers.  So, too, for the closure of the Vanguard brokerage account.  Braziel's original Schedules disclosed, in broad strokes, the division of property under the divorce decree.[26]  The initial disclosures did not itemize either the $123,511 in equity or the additional $85,000 of cash used for purchase of their house; the itemization was provided in the amended Schedules where

---

[26] The original Schedules disclosed some transfers under the divorce decree.  Braziel disclosed that the divorce decree awarded Vanessa their house, a 2002 Lexus, a 2018 Toyota, a checking account ($7,000), and the $7,500 appearance bond.  The original Schedules did not disclose the following items awarded to Vanessa in the divorce decree: three checking accounts with approximately $21,000 and Vanessa's three retirement accounts worth approximately $130,000.

Braziel disclosed the sale of their prior residence and purchase of their (now Vanessa's) residence that they owned at the time of the divorce.

The Court finds the evidence falls short of proving that Braziel knowingly and fraudulently failed to disclose the referenced transfers.[27]  Braziel made no *statement* under oath concerning a particular asset that he knew was false, and, more important, he made no statement with the intent to hinder, delay, or defraud a creditor.

The Court, from the preponderance of the evidence, concludes that Braziel's "omissions" do not establish fraudulent intent.  Braziel's original Schedules were deficient but, as amended, reveal no intent to purposefully conceal assets.

D.

Section 523(a)(6)

Plaintiffs ask the Court, in the event the Court grants the general discharge, to deny the specific discharge of Braziel's alleged debt to the plaintiffs on the grounds that the debt is for a willful and malicious injury by the debtor under § 523(a)(6).[28]  The "debt" referenced by the plaintiffs is the potential liability resulting from a civil suit plaintiffs filed against Braziel in state court.[29]  Plaintiffs' state-court claims assert negligence, negligence per se, gross negligence, and public nuisance.  None of these causes of action clearly implicate a degree of intent or willfulness.

Section 523(a)(6) provides that a discharge under § 727 "does not discharge an individual debtor from any debt … for willful and malicious injury by the debtor to another entity[.]"  In

---

[27] This is clear from his disclosure of the property division in his divorce that includes the reference to both the house and equity.

[28] In his Schedules, Braziel lists only two debts: an unsecured credit card debt of approximately $23,700 and the plaintiffs' $4,000,000 wrongful death claim.

[29] At the hearing, plaintiffs' counsel represented that liability in the suit had not been established.

*Kawaauhau v. Geiger*, the United States Supreme Court "examined the language of Section

523(a)(6) and concluded the provision applies to 'acts done with the actual intent to cause

injury,' *but excludes intentional acts that cause injury*." *Williams v. IBEW Local 520 (In re*

*Williams)*, 337 F.3d 504, 508 (5th Cir. 2003) (emphasis added) (quoting *Kawaauhau v. Geiger*,

523 U.S. 57, 61 (1998)).  "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that

nondischargeability takes a deliberate or intentional *injury*[.]"  *Kawaauhau*, 523 U.S. at 61

(emphasis in original).

Shortly after *Kawaauhau*, the Fifth Circuit clarified its § 523(a)(6) test.[30]  *See Miller v.*

*J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598 (5th Cir. 1998).  It held that "[t]he test for willful

and malicious injury under Section 523(a)(6) … is condensed into a single inquiry of whether

there exists 'either an objective substantial certainty of harm or a subjective motive to cause

harm' on the part of the debtor."[31]  *In re Williams*, 337 F.3d at 509 (quoting *In re Miller*, 156

F.3d at 606).

Braziel illegally sold a weapon to Seth Ator on October 8, 2016.  Braziel intended to sell

the weapon.  Almost three years later, Seth Ator, using the AM-15 *he bought* from Braziel, killed

and injured numerous individuals in a mass shooting.

---

[30] Prior to *Kawaauhau*, the Fifth Circuit explained its test for § 523(a)(6):

> Accordingly, today we reaffirm our place in the circuit majority identified in *In re Walker* by holding
> that, for willfulness and malice to prevent discharge under § 523(a)(6), the debtor must have
> intended the actual injury that resulted. As indicated in *Quezada* and *Walker*, *intent to injure may*
> *be established by a showing that the debtor intentionally took action that necessarily caused, or was*
> *substantially certain to cause, the injury*.

*Corley v. Delaney (In re Delaney)*, 97 F.3d 800, 802 (5th Cir. 1996) (emphasis added) (referencing *In re Walker*, 48
F.3d 1161, 1165 (11th Cir. 1995) and *In re Quezada*, 718 F.2d 121, 123 (5th Cir. 1983)).

[31] Some courts have treated what the Fifth Circuit purports to be a "single inquiry" as a "two-part test" where the court
determines if the plaintiffs have proven "either (1) an objective substantial certainty of harm; or (2) a subjective motive
to cause harm."  *Mikel v. Mikel (In re Mikel)*, No. 21-3071, 2022 WL 17418872 (Bankr. N.D. Tex. Dec. 5, 2022)
(internal quotations omitted).  In applying either test, the relevant questions are the same.

First, was there an objective certainty of harm?  Braziel sold many firearms without a license, and he did not perform background checks as required of licensed vendors; Seth Ator did not qualify to purchase the rifle, and Braziel would have known Seth Ator was not qualified had he performed a background check.  Do these facts give rise to an objective certainty of harm?  Despite the tragic events almost three years after the sale, the Court cannot conclude that Braziel could foresee or anticipate with any degree of certainty that Ator would use the gun in a mass shooting.

Second, was there a subjective motive to cause harm?  The plaintiffs provided no evidence that Braziel intended to cause any harm, let alone the injuries suffered by the plaintiffs.

Braziel's sale of the rifle to Seth Ator does not establish Braziel's intent to willfully and maliciously injure the plaintiffs here, and any resulting debt is, therefore, discharged.

### III.  Conclusion

The Court denies the plaintiffs' request to deny Braziel's discharge under §§ 727(a)(2) and 727(a)(4)(A) and, further, denies the plaintiffs' request to find their alleged debt nondischargeable under § 523(a)(6).

### End of Memorandum Opinion ###